40 C.C.P.A.(Patents)

## MASTER, WARDENS, SEARCHERS, ASSISTANTS AND COMMONALTY OF CO. OF CUTLERS IN HALLAMSHIRE, YORK COUNTY v. CRIBBEN & SEXTON CO.

### Patent Appeals No. 5931.

United States Court of Customs and Patent Appeals.

March 11, 1953.

Chauncey P. Carter, Washington, D. C., for appellant.

Horace Dawson, Chicago, Ill., for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and COLE, Judges.

O'CONNELL, Judge.

This is an appeal from the decision of the Commissioner of Patents affirming that of the Examiner of Trade-Mark Interferences dismissing the opposition filed by appellant against the registration on the principal register by appellee of the name "Sheffield" as a trade-mark for stoves and ranges, 90 USPQ 380; on reconsideration, 91 USPQ 247.

Appellant is the authorized agent of the British Government and lawful guardian of the right to the exclusive use of the name "Sheffield" by the manufacturers of metal goods located in Sheffield, England. Appellee is an Illinois corporation located in the city of Chicago, and its right to register the mark was sustained by the Patent Office

for the stated reason that the name "Sheffield" had become distinctive in commerce of appellee's stoves and ranges under Section 2(f) of the Lanham Trade-Mark Act of 1946, 15 U.S.C.A. § 1052.

The Act has been described by the Supreme Court as a complex and controversial act which confers broad jurisdictional powers upon the courts, which powers extend beyond the boundaries of the United States and govern the conduct of its citizens and residents not only at home but also upon the high seas or even in foreign countries when the rights of other nations or their nationals are not involved. Steele v. Bulova Watch Co., 344 U.S. 280, 283–284, 73 S.Ct. 252, 254. There Justice Clark in delivering the opinion of the Court observed:

"* * * The statute's expressed intent is 'to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; *and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the* United States and foreign nations.' § 45, 15 U.S.C. § 1127, 15 U.S.C.A. § 1127." [Italics supplied.]

The provisions of Section 2 of the Act, so far as pertinent, read as follows:

"§ 2. No trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

"(a) Consists of or comprises * * deceptive * * * matter; or matter which may * * * falsely suggest a connection with persons, living or dead, * * *.

* * * * * *

"(d) Consists of or comprises a mark which so resembles a mark registered in the Patent Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive purchasers: * * *.

"(e) Consists of a mark which, * * * when applied to the goods of the applicant *is primarily geographically descriptive or deceptively misdescriptive of them* * * *.

"(f) Except as expressly excluded in paragraphs (a) * * * and (d) of this section, nothing herein shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Commissioner may accept as prima facie evidence that the mark has become distinctive, as applied to the applicant's goods in commerce, *proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years next preceding* the date of the filing of the application for its *registration.*" [Italics supplied.]

Appellant's verified Notice of Opposition declares, among other things, that appellant was incorporated by an Act of the English Parliament passed in 1624; that it is the proprietor of the unabandoned mark "Sheffield" registered on August 8, 1939 in the United States Patent Office for use on certain goods manufactured in Sheffield, England, composed wholly or in part of metal, and including such items as table and kitchen knives, table forks, and choppers, all of which are used in every kitchen with stoves and ranges; that opposer is likewise the proprietor of the registered mark "Sheffield" dated July 20, 1920, and still in force and effect in the United Kingdom of Great Britain and North Ireland for stoves and ranges manufactured in Shef-

field, England, and sold throughout the world; and that the products of appellant hereinbefore described have been famous for more than 100 years throughout the civilized world, including the United States, as indicative of metal wares of the highest quality.

Rand McNally World Atlas, Readers Edition, 1943, discloses that Sheffield is located at the center of the metal-working and cutlery industry of Great Britain in and near the iron ore and coal districts of England.

The Columbia Encyclopedia, Columbia University Press, Second Edition 1950, page 1807, contains the following pertinent reference:

"*Sheffield,* county borough (1931 pop. 511,757; 1947 estimated pop. 514,290) and city, West Riding of Yorkshire, England, on the Don and E of Manchester. It is one of the leading industrial centers of England, having been the chief seat of cutlery manufacture since the 14th century. The Cutlers' Company, the governing body of cutlery manufacturers, was founded here in 1624. * * *"

The Encyclopedia Britannica, Volume 20, 1942 Edition, page 479, offers the following pertinent comments:

"*Manufactures.* Sheffield owes its prosperity to the manufacture of steel. In the valleys of the Don and its tributaries iron smelting from local ore by means of wood was carried on, probably by the Romans at Templeborough, and certainly at the time of the Norman Conquest. * * * The town had become famed for its cutlery by the 14th century and was a strong rival of London; * * *. The Cutlers Company was formed in 1624. * * * In early times, cutlery was made of blister or bar steel, later shear steel was used, but in 1740, Benjamin Huntsman introduced the manufacture of cast steel and upon this achievement many subsequent steel making discoveries have been based. It was with the aid of Sheffield capital that Henry Bessemer founded his pioneer works to de-

velop the manufacture of his invention, and so revolutionized the industry by cheapening its production. Large quantities of Bessemer steel are still made in Sheffield. * * *

"The trade in heavy steel has kept place with that in other branches and armour plates, large castings for engines and ocean liners, hydraulic presses, rails, tyres, axles, *stoves and grates,* steel shot and steel for rifles are produced. * * * The cutlery trade embraces almost every variety of instrument and tool—spring and table knives, razors, scissors, surgical and mathematical instruments, edge tools, saws, engineering and agricultural tools, etc. * * *" [Italics supplied.]

Appellant also asserted reliance upon the provision for the repression of unfair competition on the part of appellee under Section 44(h) of the Act, 15 U.S.C.A. § 1126(h), as well as the protective benefits provided for by the treaty with the United Kingdom of Great Britain based upon the Convention for the Protection of Industrial Property of the Union of Paris of March 20, 1883, revised at Brussels, Washington, The Hague, and finally enacted in permanent form at London June 2, 1934, 53 Stat. 1748. The pertinent paragraphs of Section 44, Title IX, "International Conventions," are itemized in Robert's The New Trade-Mark Manual, pages 259–260, as follows:

"(b) Persons who are nationals of, domiciled in, or have a bona fide and effective business or commercial establishment in any foreign country, which is a party to (1) the International Convention for the Protection of Industrial Property, signed at Paris on March 20, 1883; or (2) the General Inter-American Convention for Trade-Mark and Commercial Protection signed at Washington on February 20, 1929; or (3) any other convention or treaty relating to trade-marks, trade or commercial names, or the repression of unfair competition to which the United States is a party, shall be entitled to the benefits and subject to the provi-

sions of this Act to the extent and under the conditions essential to give effect to any such conventions and treaties so long as the United States shall continue to be a party thereto, except as provided in the following paragraphs of this section.

\* \* \* \* \* \*

"(g) Trade names or commercial names of persons described in paragraph (b) of this section shall be protected without the obligation of filing or registration whether or not they form parts of marks.

"(h) Any person designated in paragraph (b) of this section as entitled to the benefits and subject to the provisions of this Act shall be entitled to effective protection against unfair competition, and the remedies provided herein for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.

"(i) Citizens or residents of the United States shall have the same benefits as are granted by this section to persons described in paragraph (b) hereof."

It may be noted also that at common law the rights of owners of trade-marks have been repeatedly recognized regardless of registration. Sherwood Company, Inc., v. Sherwood Distilling Company, 44 USPO 177, 179.

The tribunals of the Patent Office apparently overlooked the Ratification of 1934 of the International Convention and the commissioner's notice to the effect that prior to July 1, 1938 the governments of the United Kingdom, Great Britain and North Ireland, in addition to that of the United States, had deposited their ratifications of the International Convention for the Protection of Industrial Property signed at London June 2, 1934, and that the Convention would come into force on August 1, 1938, with respect to these countries. 494 O.G. 1.

■ The tribunals of the Patent Office in rendering their decisions likewise made no reference to the commercial protection to which appellant was entitled under our binding treaty with Great Britain and the fact that the treaty should be construed liberally to give effect to its purpose. That treaty is part of our law and no special legislation in the United States was necessary to make it effective here. Bacardi Corp. v. Domenech, 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. 98. However, terms of the treaty applicable to the situation in the case at bar were embodied in the provisions and subdivisions of Section 44 of the Act of 1946. In re Lyndale Farm, 186 F.2d 723, 38 C.C.P.A., Patents, 825, 829.

■ A geographical name which for a long period, say for several hundred years, has referred exclusively to a product made at the place, and not to the place itself, may properly be registered as a trade-mark. Baglin v. Cusenier Co., 221 U.S. 580, 591, 31 S.Ct. 669, 671, 55 L.Ed. 863. There Chief Justice Hughes stated the rule applicable to the geographic name "Chartreuse" as a trade-mark for wines and cordials:

"\* \* \* It is undoubtedly true that names which are merely geographical cannot be the subject of exclusive appropriation as trademarks. Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied They point only at the place of production, not to the producer, and could they be appropriated exclusively, the appropriation would result in mischievous monopolies.' Delaware and Hudson Canal Company v. Clark, 13 Wall. [311], p. 324, 20 L.Ed. [581], 583. See also Columbia Mill Company v. Alcorn, 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144; Elgin National Watch Company v. Illinois Watch Case Company, 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365.

"This familiar principle, however, is not applicable here. \* \* \* If it be assumed that the Monks took their name from the region in France in which they settled in the eleventh century, it still remains true that it became peculiarly their designation. And the

word 'Chartreuse,' as applied to the liqueur which for generations they made and sold, cannot be regarded in a proper sense as a geographical name. * * *"

The Chartreuse case was decided under the Act of 1905 and before the advent of the broadened protective provisions of the Lanham Act. That Act, however, and its "sweeping reach into 'all commerce which may * * * be regulated by Congress' does not constrict prior law or deprive courts of jurisdiction previously exercised." Steele v. Bulova Watch Co., 344 U.S. 280, 287, 73 S.Ct. 252, 256.

█ The proper construction of Section 2(f) of the Act of 1946 was exemplified by Federico, Examiner-in-Chief of Trade-Marks, acting for the Commissioner of Patents, in Ex parte Pocket Books, Inc., 91 USPQ 182, 184–185. There the Acting Commissioner held the burden of proof rests upon the applicant to establish that the mark of the applicant has become distinctive in commerce, and distinctiveness as a trade-mark should not be recognized without completely overwhelming proof with respect to all aspects of the matter:

"It seems to me that before it can be stated that a word which is a generic designation of an article can be considered as having acquired the status of a trade mark of a single company for that same article, more should be shown than use by the applicant and the harmonious attitude of the trade. *It would appear that before the word could be considered a trade mark, it must have become practically obsolete as a generic name for the article and must be recognized by the public as a trade mark rather than as a generic term of the English language.* [Italics supplied.]"

█ The factual situation upon which the applicant relies in the case at bar is strikingly similar to the situation in Ex parte Pocket Books, Inc. The mere affidavit of appellee's secretary together with the testimony of several witnesses clearly does not constitute a sufficient basis for appellee's registration of the mark "Sheffield" for use on stoves and ranges in this and foreign countries.

█ The certificate of the British Patent Office that the trade-mark "Sheffield" was registered in Great Britain for stoves and ranges was an official document which should have been considered by the administrative officials of the Patent Office as presumptive evidence that the mark was still in force and effect there for stoves and ranges. Rosengart, etc., v. Ostrex Co., Inc., 136 F.2d 249, 30 C.C.P.A., Patents, 1046; Ely & Walker Dry Goods Co. v. Sears, Roebuck & Co., 90 F.2d 257, 24 C.C.P.A., Patents, 1244; Hess v. Helene Curtis Industries, Inc., 94 USPQ 11.

█ If we assume, merely for the purpose of argument, that tableware and kitchen cutlery do not constitute goods of the same descriptive properties with stoves and ranges, it must be remarked that refusal of registration may be required under the Act of 1946 where there is likelihood of confusion, even though technically the goods may fall into different categories. The Pep Boys—Manny, Moe and Jack v. Edwin F. Guth Co., 197 F.2d 527, 39 C.C.P.A., Patents, 1015, 1017; Alligator Co. v. Larus & Bro. Co., Inc., 196 F.2d 532, 39 C.C.P.A., Patents, 939.

█ It is impossible to escape the conclusion that appellee should be refused registration of its mark "Sheffield" on the ground, among other things, that basically it consists of matter which falsely suggests a connection with the renowned manufacturing industry of steel located at Sheffield, England.

For the reasons hereinbefore stated, the decision of the Commissioner of Patents is reversed.

Reversed.

JOHNSON, Judge, concurs in conclusion.