**VANITY FAIR MILLS, Inc., Plaintiff-Appellant,**

v.

**The T. EATON CO. Limited and John David Eaton, Defendants-Appellees.**

No. 251, Docket 23831.

United States Court of Appeals Second Circuit.

Argued April 4, 5, 1956.

Decided June 1, 1956.

**636**

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Toulmin & Toulmin, Dayton, Ohio (Harry A. Toulmin, Jr., Wm. H. Pavitt, Jr., Dayton, Ohio, of counsel), for plaintiff-appellant.

Cadwalader, Wickersham & Taft, New York City (Jacquelin A. Swords, New York City, of counsel), for defendants-appellees.

Before FRANK, MEDINA and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

■ This case presents interesting and novel questions concerning the extraterritorial application of the Lanham Act, 15 U.S.C.A. § 1051 et seq., and the International Convention for the Protection of Industrial Property (Paris Union), 53 Stat. 1748 (1883, as revised 1934), T.S.No.941. Plaintiff's complaint, filed November 18, 1954, and amended January 18, 1955, alleged trade-mark infringement and unfair competition both in the United States and Canada. Defendants moved to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., on the grounds that the district court lacked jurisdiction over the person of the individual defendant, John D. Eaton, and the corporate defendant, The T. Eaton Co.; that the district court lacked jurisdiction over the subject matter of the complaint insofar as it related to defendants' alleged trade-mark infringement and unfair competition in the Dominion of Canada; and that the district court was an inconvenient forum for the trial of those issues. The district court found that it had personal jurisdiction over the corporate defendant, and no issue concerning personal jurisdiction is raised by this appeal.[1] However, the

---

1. The district court reserved judgment on the issue of whether or not there was personal jurisdiction over the individual defendant, John David Eaton. That issue

district court held that it lacked subject-matter jurisdiction over that portion of the complaint raising Canadian trade-mark issues, and, alternatively, that it was an inconvenient forum for the trial of such issues. That portion of the complaint asserting claims based upon violation of United States trade-marks and unfair competition in this country was recognized by the district court as within its jurisdiction, but because the complaint was thought to inextricably combine the Canadian and American issues, the court dismissed the complaint in its entirety, with leave to file an amended complaint stating separately the American issues. Plaintiff chose to stand on its original complaint, and appealed from the judgment dismissing the complaint.[2]

Although the parties presented many affidavits, depositions, and exhibits for the consideration of the district court, there has been no trial of facts, and the complaint is unanswered. On an appeal from a judgment granting a motion to dismiss a complaint for lack of federal jurisdiction, we must assume the truth of the facts stated in the complaint.[3] On the basis of the plaintiff's complaint, the following facts may be assumed to be true for the purpose of this appeal:

Plaintiff, Vanity Fair Mills, Inc., is a Pennsylvania corporation, having its principal place of business at Reading, Pennsylvania. It has been engaged in the manufacture and sale of women's underwear under the trade-mark "Vanity Fair" since about the year 1914 in the United States, and has been continuously offering its branded merchandise for sale in Canada since at least 1917. Plaintiff has publicized its trade-mark "Vanity Fair" on feminine underwear in the United States since 1914, and since 1917 has regularly expended large sums of money in advertising and promoting its trademark both in the United States and Canada. As a result of the high quality of plaintiff's merchandise, and its extensive sales promotion and advertising, the name "Vanity Fair" has become associated throughout the United States and Canada with plaintiff's products.

Beginning in 1914 plaintiff has protected its trade-mark rights by registrations with the United States Patent Office of the trade-mark "Vanity Fair" as applying to various types of underwear. It has been continuously manufacturing and selling feminine underwear under these trade-mark registrations since about the year 1914.

Defendant, The T. Eaton Company, Limited, is a Canadian corporation engaged in the retail merchandising business throughout Canada, with its principal office in Toronto, Ontario. It has a regular and established place of business within the Southern District of New York. On November 3, 1915, defendant filed with the proper Canadian official an application for the registration in Canada of the trade-mark "Vanity Fair," claiming use in connection with the sale of "Women's, Misses' and Children's Coats, Suits, Cloaks, Waists, Dresses, Skirts, Corsets, Knitted Goods, Gloves, Hosiery, Boots & Shoes, Outer Garments, and other Wearing Apparel." On November 10, 1915, the proper Canadian official granted defendant's application for the registration of that mark. Plaintiff asserts that this registration applies only to feminine outerwear, and that in any

is irrelevant on this appeal, and reference will hereafter be made only to the corporate defendant, the T. Eaton Co. Limited.

2. The judgment appealed from is appealable both because it is an appeal from an order "refusing * * * injunctions" within 28 U.S.C. § 1292(1), see Telechron, Inc. v. Parissi, 2 Cir., 1952, 197 F.2d 757, and because the judgment dismissing plaintiff's amended complaint was a final order. See Crutcher v. Joyce, 10 Cir.,

1943, 134 F.2d 809; Cleary Brothers v. Christie Scow Corporation, 2 Cir., 1949, 176 F.2d 370.

3. See Steele v. Bulova Watch Co., 1952, 344 U.S. 280, 284, 73 S.Ct. 252, 97 L.Ed. 252; United States v. New Wrinkle, 1952, 342 U.S. 371, 376, 72 S.Ct. 350, 96 L.Ed. 417; Kroese v. General Steel Castings Corporation, 3 Cir., 1950, 179 F.2d 760, 761, 15 A.L.R.2d 1117.

event it is merely a "paper registration" because of non-use. In 1919 plaintiff sought to register the trade-mark "Vanity Fair" in Canada for "ready made underwear," but its application was rejected as a matter of course because of the prior registration of defendant. In 1933 defendant, in reply to a request of the Canadian Registrar of Trade-Marks, listed "women's underwear, corsets, girdles and other foundation garments" as the goods in connection with which it had actually been using the mark "Vanity Fair," and its registration was modified accordingly. Plaintiff alleges that defendant, by this informal procedure, amended its trade-mark registration in Canada to include, for the first time, feminine underwear.

During the years 1945–1953 the defendant ceased to use its own "Vanity-Fair" trade-mark, purchased branded merchandise from the plaintiff, and sold this merchandise under advertisements indicating that it was of United States origin and of plaintiff's manufacture. These purchases by defendant from plaintiff were made through defendant's New York office. In 1953 defendant resumed the use of its own trade-mark "Vanity Fair" and, simultaneously, under the same trade-mark, sold plaintiff's branded merchandise and cheaper merchandise of Canadian manufacture. Defendant at this time objected to plaintiff's sales of its branded merchandise to one of defendant's principal competitors in Canada, the Robert Simpson Company. The Simpson Company discontinued purchases of plaintiff's branded merchandise after being threatened with infringement suits by defendant.

Plaintiff alleges that these acts constitute a conspiracy on the part of the corporate defendant and its officers and agents to appropriate for their own benefit plaintiff's registered and common-law trade-mark. It asserts that defendant, by purchasing plaintiff's branded merchandise for a period of years and advertising and selling such merchandise as plaintiff's goods, attempted to associate plaintiff's trade-mark with itself, and, that purpose having been accomplished, defendant then began using the trade-mark "Vanity Fair" in connection with its own inferior feminine underwear, discontinued purchases from plaintiff, and threatened its competitors in Canada with infringement suits if they continued to sell plaintiff's branded merchandise in Canada.

Finally, plaintiff asserts that defendant has advertised feminine underwear in the United States under the trade-mark "Vanity Fair," and that it has sold such underwear by mail to customers residing in the United States.

The complaint seeks injunctive relief against the use by defendant of the trade-mark "Vanity Fair" in connection with women's underwear both in Canada and the United States, a declaration of the superior rights of the plaintiff in such trade-mark, and an accounting for damages and profits.

The initial question is whether the district court had jurisdiction over all, or only part, of the action. Plaintiff's complaint asserted federal jurisdiction both because it raised substantial federal questions under the Lanham Act, 15 U.S.C.A. § 1051 et seq., and the International Convention for the Protection of Industrial Property, 53 Stat. 1748, and because of the presence of diversity of citizenship and the requisite jurisdictional amount, 28 U.S.C. § 1332. Regardless of the existence of the other asserted grounds for federal jurisdiction, the allegations of diversity of citizenship and of the requisite jurisdictional amount were sufficient to vest the district court with jurisdiction over the entire action.

Plaintiff, however, does not rely other than incidentally on diversity as the basis for federal jurisdiction, but asserts that its claims arise under the laws of the United States and should be governed by those laws. The result sought—extraterritorial application of American law—is contrary to usual conflict-of-laws principles. *First*, the legal status of foreign nationals in the United

States is determined solely by our domestic law—foreign law confers no privilege in this country that our courts are bound to recognize. Ingenohl v. Walter E. Olsen & Co., 1927, 273 U.S. 541, 47 S. Ct. 451, 71 L.Ed. 762; United Drug Co. v. Theodore Rectanus Co., 1915, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Baglin v. Cusenier Co., 1911, 221 U.S. 580, 31 S.Ct. 669, 55 L.Ed. 863. And when trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trade-mark rights of the parties are irrelevant and inadmissible. George W. Luft Co. v. Zande Cosmetic Co., 2 Cir., 1944, 142 F.2d 536, 539. Similarly, the rights and liabilities of United States citizens who compete with foreign nationals in their home countries are ordinarily to be determined by the appropriate foreign law. Ingenohl v. Olsen & Co., supra, 273 U.S. at page 544, 47 S. Ct. at page 452. This fundamental principle, although not without exceptions, is the usual rule, and is based upon practical considerations such as the difficulty of obtaining extraterritorial enforcement of domestic law, as well as on considerations of international comity and respect for national integrity. *Second*, the creation and extent of tort liability is governed, according to the usual rule, by the law of the place where the alleged tort was committed (*lex loci delicti*).[4] The place of the wrong (*locus delicti*) is where the last event necessary to make an actor liable takes place.[5] If the conduct complained of is fraudulent misrepresentation, the place of the wrong is not where the fraudulent statement was made, but where the plaintiff, as a result thereof, suffered a loss.[6] Thus in cases of trade-mark infringement and unfair competition, the wrong takes place not where the deceptive labels are affixed to the goods or where the goods are wrapped in the misleading packages, but where the passing off occurs, i. e., where the deceived customer buys the defendant's product in the belief that he is buying the plaintiff's.[7] In this case, with the exception of defendant's few mail order sales into the United States, the passing-off occurred in Canada, and hence under the usual rule would be governed by Canadian law.

Conflict-of-laws principles, however,

---

4. Consult Restatement, Conflict of Laws §§ 377–390 (1934); Hancock, Torts in the Conflict of Laws, xvii, 21–53 (1952); Lorenzen, Selected Articles on the Conflict of Laws, 1–18, 360–378 (1947). The rule of *lex loci delicti* is well established both in the federal courts and in the courts of New York. See, e. g., Cuba R. Co. v. Crosby, 1912, 222 U.S. 473, 32 S.Ct. 132, 56 L.Ed. 274; Conklin v. Canadian-Colonial Airways, Inc., 1935, 266 N.Y. 244, 194 N.E. 692. Cf. discussion in Walton v. Arabian American Oil Co., 2 Cir., 1956, 233 F.2d 541.

5. Restatement, Conflict of Laws § 377 (1934).

6. Ibid. Rules 4 and 5, Illustrations 5 and 6.

7. With the exception of George W. Luft v. Zande Cosmetic Co., 2 Cir., 1944, 142 F.2d 536, the few American cases which have involved acts of unfair competition committed in other countries have ignored these conflict-of-laws principles. In Vacuum Oil Co. v. Eagle Oil Co., C.C.N.J. 1907, 154 F. 867, affirmed 3 Cir., 1908, 162 F. 671, certiorari denied 214 U.S. 515, 29 S.Ct. 696, 53 L.Ed. 1063, and Morris v. Altstedter, 1916, 93 Misc. 329, 156 N.Y.S. 1103, the courts presumed that the laws concerning unfair competition of every civilized country were identical to those of the forum. In Hecker-H-O Co. v. Holland Food Corporation, 2 Cir., 1929, 36 F.2d 767, distinguished in George W. Luft Co. v. Zande Cosmetic Co., supra, the court did not consider the effect of the defendant's having a presumably valid foreign trade-mark in deciding that the Trade-Mark Act of 1905 was violated by affixing infringing labels in the United States on goods shipped to foreign countries.

For discussions of conflict-of-laws principles as they refer to unfair competition, consult Wengler, Law Concerning Unfair Competition and the Conflict of Laws, 4 Am.J. of Comp.Law 167 (1955); Note, The Bulova Case: Lex Loci Delicti v. International Trade-Mark Protection, 47 N. W.U.L.Rev. 677 (1952); Note, The Choice of Law in Multistate Unfair Competition: A Legal-Industrial Enigma, 60 Harv.L.Rev. 1315 (1947).

are not determinative of the question whether the International Convention and/or the Lanham Act provide relief in American courts and under American law against acts of trade-mark infringement and unfair competition committed in foreign countries by foreign nationals. If the International Convention or the Lanham Act provide such relief, and if the provisions are within constitutional powers, American courts would be required to enforce these provisions.[8] It is therefore necessary to determine whether the International Convention or the Lanham Act provide such relief. Only if it is determined that they do not provide such extensive relief, and hence that the only jurisdictional basis for the suit is diversity of citizenship, do we reach the question whether the district court abused its discretion in dismissing the complaint because of *forum non conveniens*.

### I. The International Convention

Plaintiff asserts that the International Convention for the Protection of Industrial Property (Paris Union), 53 Stat. 1748 (1883, as revised 1934), T.S.No.941, to which both the United States and Canada are parties, is self-executing; that by virtue of Article VI of the Constitution it is a part of the law of this country which is to be enforced by its courts; and that the Convention has created rights available to plaintiff which protect it against trademark infringement and unfair competition in foreign countries. Plaintiff would appear to be correct in arguing that no special legislation in the United States was necessary to make the International Convention effective here,[9] but it erroneously maintains that the Convention created private rights *under American law* for acts of unfair competition occurring in foreign countries.

The International Convention is essentially a compact between the various member countries to accord in their own countries to citizens of the other contracting parties trade-mark and other rights comparable to those accorded their own citizens by their domestic law. The underlying principle is that foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens. In addition, the Convention sought to create uniformity in certain respects by obligating each member nation "to assure to nationals of countries of the Union an effective protection against unfair competition."[10]

The Convention is not premised upon the idea that the trade-mark and related laws of each member nation shall be given extraterritorial application, but on exactly the converse principle that each nation's law shall have only territorial application. Thus a foreign national of a member nation using his trade-mark in commerce in the United States is accorded extensive protection here against infringement and other

---

8. See Steele v. Bulova Watch Co., 1952, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319; United States v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, 443.

9. Bacardi Corporation of America v. Domenech, 1940, 311 U.S. 150, 61 S.Ct. 219, 85 L.Ed. 98; Master, Wardens, etc., v. Cribben & Sexton Co., Cust. & Pat. App.1953, 202 F.2d 779, 783; La Republique Francaise v. Schultz, C.C.N.Y.1893, 57 F. 37; Kerry v. Toupin, C.C.Mass. 1894, 60 F. 272, 273.

10. Article 10 *bis* of the International Convention, 53 Stat. 1780, T.S.No.941, reads as follows:

"(1) The countries of the Union are bound to assure to nationals of countries of the Union an effective protection against unfair competition.

"(2) Any act of competition contrary to honest practice in industrial or commercial matters constitutes an act of unfair competition.

"(3) The following particularly are to be forbidden: 1°. All acts whatsoever of a nature to create confusion in any way whatsoever with the establishment, the goods, or the services of the competitor; 2°. False allegations in the conduct of trade of a nature to discredit the establishment, the goods, or the services of a competitor."

See 4 Callmann, Unfair Competition and Trade-Marks § 99.2 (2d ed., 1950).

types of unfair competition by virtue of United States membership in the Convention. But that protection has its source in, and is subject to the limitations of, American law, not the law of the foreign national's own country. Likewise, the International Convention provides protection to a United States trade-mark owner such as plaintiff against unfair competition and trademark infringement in Canada—but only to the extent that Canadian law recognizes the treaty obligation as creating private rights or has made the Convention operative by implementing legislation. Under Canadian law, unlike United States law, the International Convention was not effective to create any private rights in Canada without legislative implementation.[11] However, the obligations undertaken by the Dominion of Canada under this treaty have been implemented by legislation, most recently by the Canadian Trade Marks Act of 1953, 1–2 Elizabeth II, Chapter 49. If plaintiff has any rights under the International Convention (other than through § 44 of the Lanham Act, discussed below), they are derived from this Canadian law, and not from the fact that the International Convention may be a self-executing treaty which is a part of the law of this country.

## II. The Lanham Act

Plaintiff's primary reliance is on the Lanham Act, 15 U.S.C.A. §§ 1051–1127, 60 Stat. 427, a complex statute conferring broad jurisdictional powers on the federal courts. Plaintiff advances two alternative arguments, the first one based on the decision of the Supreme Court in Steele v. Bulova Watch Co., 1952, 344 U. S. 280, 73 S.Ct. 252, 97 L.Ed. 319, giving the provisions of the Lanham Act an extraterritorial application against acts committed in Mexico by an American citizen, and the second based specifically on § 44 of the Act, 15 U.S.C.A. § 1126, which was intended to carry out our ob-ligations under the International Conventions.

### A. *General Extraterritorial Application of the Lanham Act— the Bulova Case.*

Section 32(1) (a) of the Lanham Act, 15 U.S.C.A. § 1114(1) (a), one of the more important substantive provisions of the Act, protects the owner of a registered mark from use "in commerce" by another that is "likely to cause confusion or mistake or to deceive purchasers as to the source of origin" of the other's good or services. "Commerce" is defined by the Act as "all commerce which may lawfully be regulated by Congress." § 45, 15 U.S.C.A. § 1127. Plaintiff, relying on Steele v. Bulova Watch Co., 1952, 344 U. S. 280, 73 S.Ct. 252, 97 L.Ed. 252, argues that § 32(1) (a) should be given an extraterritorial application, and that this case falls within the literal wording of the section since the defendant's use of the mark "Vanity Fair" in Canada had a substantial effect on "commerce which may be lawfully be regulated by Congress."

■■■■ While Congress has no power to regulate commerce in the Dominion of Canada, it does have power to regulate commerce "with foreign Nations, and among the several States." Const. art. 1, § 8, cl. 3. This power is now generally interpreted to extend to all commerce, even intrastate and entirely foreign commerce, which has a substantial effect on commerce between the states or between the United States and foreign countries. Thomsen v. Cayser, 1917, 243 U.S. 66, 88, 37 S.Ct. 353, 61 L. Ed. 597; N. L. R. B. v. Jones & Laughlin S. Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; Mandeville Island Farms v. American Crystal Sugar Co., 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; Moore v. Mead's Fine Bread Co., 1954, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145; Branch v. Federal Trade Commission, 7

---

11. Albany Packing Co., Inc. v. Registrar of Trade Marks [1940], Ex.C.R. 256, 265–266; Arrow Slide & Boom Co. v. Pigeon Lumber Co. [1930], 65 O.L.R. 575, 580 ff., 66 O.L.R. 577, 578 [1932], S.C.R. 495, 510.

Cir., 1944, 141 F.2d 31. Particularly is this true when a conspiracy is alleged with acts in furtherance of that conspiracy taking place in both the United States and foreign countries. United States v. Sisal Sales Corporation, 1927, 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042; United States v. Imperial Chemical Industries, D.C.S.D.N.Y.1951, 100 F.Supp. 504; see Note, Application of the Anti-Trust Laws to Extra-Territorial Conspiracies, 49 Yale L.J. 1312 (1940) and cases cited therein. Thus it may well be that Congress could constitutionally provide infringement remedies so long as the defendant's use of the mark has a substantial effect on the foreign or interstate commerce of the United States. But we do not reach this constitutional question because we do not think that Congress intended that the infringement remedies provided in § 32(1) (a) and elsewhere should be applied to acts committed by a foreign national in his home country under a presumably valid trademark registration in that country.

The Lanham Act itself gives almost no indication of the extent to which Congress intended to exercise its power in this area. While § 45, 15 U.S.C.A. § 1127, states a broad definition of the "commerce" subject to the Act, both the statement of Congressional intent in the same section [12] and the provisions of § 44, 15 U.S.C.A. § 1126, indicate Congressional regard for the basic principle of the International Conventions, i. e., equal application to citizens and foreign nationals alike of the territorial law of the place where the acts occurred. And the Supreme Court, in Steele v. Bulova Watch Co., 1952, 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 319, the only other extra-territorial case since the Lanham Act, did not intimate that the Act should be given the extreme interpretation urged upon us here.

In the Bulova case, supra, the Fifth Circuit, 194 F.2d 567, assuming that the defendant had a valid registration under Mexican law, found that the district court had jurisdiction to prevent the defendant's use of the mark in Mexico, on the ground that there was a sufficient effect on United States commerce. Subsequently, the defendant's registration was canceled in Mexican proceedings, and on review of the Fifth Circuit's decision, the Supreme Court noted that the question of the effect of a valid registration in the foreign country was not before it. The Court affirmed the Fifth Circuit, holding that the federal district court had jurisdiction to prevent unfair use of the plaintiff's mark in Mexico. In doing so the Court stressed three factors: (1) the defendant's conduct had a substantial effect on United States commerce; (2) the defendant was a United States citizen and the United States has a broad power to regulate the conduct of its citizens in foreign countries; and (3) there was no conflict with trade-mark rights established under the foreign law, since the defendant's Mexican registration had been canceled by proceedings in Mexico. Only the first factor is present in this case.

We do not think that the Bulova case lends support to plaintiff; to the contrary, we think that the rationale of the Court was so thoroughly based on the power of the United States to govern "the conduct of *its own citizens* upon the high seas or even in foreign countries *when the rights of other nations or their*

---

12. "The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commence [*sic*] from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; *and to provide rights and remedies stipulated by treaties and conventions respecting trade-marks, trade names, and unfair competition entered into between the United States and foreign nations.*" 15 U.S.C.A. § 1127. [Emphasis added.]

*nationals are not infringed"*,[13] that the absence of one of the above factors might well be determinative and that the absence of both is certainly fatal.[14] Plaintiff makes some argument that many American citizens are employed in defendant's New York office, but it is abundantly clear that these employees do not direct the affairs of the company or in any way control its actions. The officers and directors of defendant who manage its affairs are Canadian citizens. Moreover, the action has only been brought against Canadian citizens. We conclude that the remedies provided by the Lanham Act, other than in § 44, should not be given an extraterritorial application against foreign citizens acting under presumably valid trade-marks in a foreign country.

### B. *Section 44 of the Lanham Act.*

 Plaintiff's alternative contention is that § 44 of the Lanham Act, which is entitled "International Conventions," affords to United States citizens all possible remedies against unfair competition by foreigners who are nationals of convention countries, including the relief requested in this case. Subsection (b) of § 44 specifies that nationals of foreign countries signatory to certain named conventions (including the Paris Union signed by Canada) are "entitled to the benefits * * * [of the Act] to the extent * * * essential to give effect to [the conventions]." Subsection (g) then provides that the trade names of persons described in subsection (b), i. e., nationals of foreign countries which have signed the conventions, "shall be protected without the obligation of filing or registration whether or not they form parts of marks", and subsection (h) provides that the same persons "shall be entitled to effective protection against unfair competition * * *" Finally, subsection (i) provides that "citizens or residents of the United States shall have the same benefits as are granted by this section to persons described in subsection (b) * * *" Thus § 44 first implements the international agreements by providing certain foreign nationals with the benefits contained in those agreements, then, in subsection (i), places American citizens on an equal footing by providing them with the same benefits. See American Auto. Ass'n v. Spiegel, 2 Cir., 1953, 205 F.2d 771; L'Aiglon Apparel v. Lana Lobell, Inc., 3 Cir., 1954, 214 F.2d 649. Since American citizens are given only the same benefits granted to eligible foreign nationals, the benefits

---

13. 344 U.S. 280, 285, 286, 73 S.Ct. 252, 255. [Emphasis added.] The following quotations from the opinion of the Court indicate the importance to the decision of the two factors referred to:

"* * * Congress in prescribing standards of conduct *for American citizens* may project the impact of its laws beyond the territorial boundaries of the United States." 344 U.S. at page 282, 73 S.Ct. at page 254.

"* * * 'Congress has the power to prevent unfair trade practices in foreign commerce *by citizens of the United States*, although some of the acts are done outside the territorial limits of the United States.'" 344 U.S. at page 286, 73 S.Ct. at page 255.

"* * * Mexico's courts have nullified the Mexican registration of 'Bulova'; there is thus no conflict which might afford petitioner a pretext that such relief would impugn foreign law. The question, therefore, whether a valid foreign registration would affect either the power to enjoin or the propriety of its exercise is not before us. Where, as here, *there can be no interference with the sovereignty of another nation*, the District Court in exercising its equity powers may command persons properly before it to cease or perform acts outside its territorial jurisdiction. * * *" 344 U.S. at page 289, 73 S.Ct. at page 257.

14. At the time the Fifth Circuit decided the Bulova case, 194 F.2d 567, the defendant's Mexican registration had not been canceled. Since the Fifth Circuit assumed that the defendant had a valid Mexican registration, it thought the presence or absence of a foreign trade-mark was not a determinative factor. Cf. George W. Luft Co. v. Zande Cosmetic Co., 2 Cir., 1944, 142 F.2d 536. We need not decide that question because of the additional fact that the defendant here is not an American citizen.

conferred on foreign nationals must be examined to see whether they have any extraterritorial application.

The benefits provided by § 44 (without attempting to be exhaustive) may be summarized as follows:[15] a foreign national may register his foreign mark upon the production of a certificate of registration issued by his country of origin, even though he has not used his mark in United States commerce, § 44 (c), 15 U.S.C.A. § 1126(c); in determining priority of filing, if the foreign national has filed for registration in the United States within six months after filing abroad, he may make use of his foreign filing date but if his foreign registration antedates the six month period, he may use only his United States filing date, § 44(d), 15 U.S.C.A. § 1126(d); a foreign national may register his foreign mark on the Principal Register if they are eligible, and, if not, on the Supplemental Register, § 44(e), 15 U.S.C.A. § 1126(e); a foreign national may prevent the importation into the United States of goods bearing infringing marks or names, § 42, 15 U.S.C.A. § 1124; once a foreign mark has been registered under the Lanham Act, its status in the United States is independent of the continued validity of its registration abroad, and its duration, validity, and transfer in the United States are governed by "the provisions of this chapter", § 44(f), 15 U.S.C.A. § 1126(f). It will be noted that all of these benefits are internal to the United States in the sense that they confer on foreign nationals certain rights in the United States. None of them could have extraterritorial application, for all of them relate solely to the registration and protection of marks within the United States.

We now come to the two remaining benefits specified in § 44, and the ones upon which plaintiff relies: the provision in subsection (g) protecting tradenames without the obligation of filing or registration, and the provision in subsection (h) entitling eligible foreign nationals "to effective protection against unfair competition" and making available "the remedies provided in this chapter for infringement of marks * * * so far as they may be appropriate in repressing acts of unfair competition." Here again, we think that these benefits are limited in application to within the United States. It is true that they are not expressly so limited, but it seems inconceivable that Congress meant by this language to extend to all eligible foreign nationals a remedy *in the United States against unfair competition occurring in their own countries.* Moreover, if § 44 were so interpreted, it would apply to commerce which is beyond the Congressional power to regulate, and a serious constitutional question would be created. In the absence of any Congressional intent to provide remedies of such extensive application, we interpret § 44 in a manner which avoids constitutional questions and which carries out the underlying principle of the International Conventions sought to be implemented by § 44—the principle that each nation shall apply its national law equally to foreigners and citizens alike.

Since United States citizens are given by subsection (i) of § 44 only the same benefits which the Act extends to eligible foreign nationals, and since the benefits conferred on those foreign nationals have no extraterritorial application, the benefits accorded to citizens by this section can likewise have no extraterritorial application.[16]

15. See Ladas, The Lanham Act and International Trade, 14 Law and Contemp. Problems 269 (1949); 4 Callmann, Unfair Competition and Trade-Marks § 99.2 (a) (2d ed., 1950).

16. The fact that United States citizens have already been given benefits by other provisions of the Lanham Act similar or identical to those contained in § 44 should not obscure the fact that subsection (i) added certain rights which United States citizens would not otherwise have had. For example, citizens or residents of the United States who have a "bona fide and effective business or commercial establishment" in a foreign coun-

### III. Forum Non Conveniens

 With respect to the trademark infringement and unfair competition alleged to have occurred within Canada, the complaint, as we have seen, does not state a claim arising under the laws of the United States. Therefore, the jurisdiction of the district court over this part of the action rests solely on diversity of citizenship.[17] Plaintiff contends that actions for unfair competition are transitory, and that the district court was required to exercise its jurisdiction over the action, even though the passing off occurred outside of the United States, because plaintiff is an American citizen and personal jurisdiction over defendant can be obtained within the United States only in the Southern District of New York. We think, however, that the district court did not abuse its discretion in declining to exercise its jurisdiction over that portion of the case arising in Canada and governed by Canadian trade-mark law.

 The doctrine of *forum non conveniens* is now firmly established in federal law. Koster v. Lumbermen's Mut. Casualty Co., 1947, 330 U.S. 518, 67 S. Ct. 828, 91 L.Ed. 1067; Gulf Oil Corporation v. Gilbert, 1947, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055. 28 U.S.C. § 1404(a) has, in effect, codified and re-

placed this doctrine whenever the more convenient tribunal is a United States district court where the action " 'might have been brought.' " Norwood v. Kirkpatrick, 1955, 349 U.S. 29, 75 S.Ct. 544, 547, 99 L.Ed. 789. But the federal courts retain the inherent power to refuse jurisdiction of cases not within § 1404(a) —cases which should have been brought in a foreign jurisdiction, rather than in the United States. De Sairigne v. Gould, 2 Cir., 1949, 177 F.2d 515, affirming D.C., 83 F.Supp. 270, certiorari denied 339 U. S. 912, 70 S.Ct. 571, 94 L.Ed. 1338; Latimer v. S/A Industrias Reunidas F. Matarazzo, D.C.S.D.N.Y.1950, 91 F.Supp. 469. Whether jurisdiction should be declined is determined by balancing conveniences, but the plaintiff's choice of forum will not be disturbed unless the balance is strongly in favor of the defendant. See Gulf Oil Corporation v. Gilbert, supra, 330 U.S. at pages 504–509, 67 S.Ct. at pages 840, 843. Finally, in the determination of a motion to dismiss for *forum non conveniens*, the court may consider affidavits submitted by the moving and opposing parties. Koster v. Lumbermen's Mut. Casualty Co., supra, 330 U.S. at page 531, 67 S.Ct. at page 835.

 An American citizen does not have an absolute right under all circumstances to sue in an American court. De

---

try, within the meaning of subsection (b), may register any trade-marks which they have registered in that foreign country in the same manner as that provided for foreign nationals and with the same filing priorities. Thus § 44(i) has meaning independent of its possible significance as a source of a substantive federal law of unfair competition. See Stauffer v. Exley, 9 Cir., 1950, 184 F.2d 962, and Pagliero v. Wallace China Co., 9 Cir., 1952, 198 F.2d 339, where the Ninth Circuit held that § 44(i) created a substantive federal law of unfair competition wherever interstate commerce is involved, and hence that federal district courts have federal-question jurisdiction over all claims of unfair competition brought by those engaged in interstate commerce. In American Auto. Ass'n v. Spiegel, 2 Cir., 1953, 205 F.2d 771, we held to the contrary; and the Third Circuit has since

come to the same conclusion, L'Aiglon Apparel v. Lana Lobell, Inc., 3 Cir., 1954, 214 F.2d 649. The Supreme Court has not yet passed on the question.

17. In a diversity action brought to enforce state-created rights, we must apply the law of New York, including its conflict-of-laws rules. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. New York follows the almost universal rule that the law governing a tort is the law of the place where the alleged wrong occurred. See Conklin v. Canadian-Colonial Airways, Inc., 1935, 266 N.Y. 244, 248, 194 N.E. 692, 694; Loucks v. Standard Oil Co., 1918, 224 N.Y. 99, 120 N.E. 198; Whitford v. Panama R. Co., 1861, 23 N.Y. 465, 466. Consequently, Canadian law governs the unfair competition occurring in Canada.

Sairigne v. Gould, supra; United States M & S Ins. Co. v. A/S Den Norske O G Australie Line, 2 Cir., 1933, 65 F.2d 392; Wheeler v. Societe Nationale des Chemins, etc., D.C.S.D.N.Y.1952, 108 F.Supp. 652. However, where, as here, application of the doctrine of *forum non conveniens* would force an American citizen to seek redress in a foreign court, courts of the United States are reluctant to apply the doctrine. Burt v. Isthmus Development Co., 5 Cir., 1955, 218 F.2d 353; The Saudades, D.C.E.D.Pa.1946, 67 F. Supp. 820; cf. Swift & Co., Packers v. Compania Columbiana Del Caribe S/A, 1950, 339 U.S. 684, 697, 70 S.Ct. 861, 94 L.Ed. 1206.

We are convinced that the balance of convenience is strongly in favor of defendant,[18] but it is unnecessary for the following reasons for us to rely solely on that ground.

The crucial issue in this case is the validity of defendant's Canadian trade-mark registration under Canadian trade-mark law. The Canadian Registrar of Trade-Marks has registered the mark "Vanity Fair" in defendant's name and has refused registration of plaintiff's "Vanity Fair" mark on the ground that it interfered with defendant's prior registration. Sections 6 and 19 of the Canadian Trade-Mark Act of 1952 give the Canadian registrant of a trade-mark the statutory right to prevent the use in Canada of a confusing mark, unless the Canadian registration is shown to be invalid. Such a showing could be made in any Canadian court of competent jurisdiction as a defense to an infringement action brought by defendant, or plaintiff could initiate proceedings in the Exchequer Court of Canada to expunge or amend defendant's registration. §§ 18 and 56. The Exchequer Court is given exclusive jurisdiction by § 56 to expunge or amend a trade-mark registration. Under these circumstances, we do not think a United States district court should take jurisdiction over that portion of this action turning on the validity or invalidity of defendant's Canadian trademark.

In the first place, courts of one state are reluctant to impose liability upon a person who acts pursuant to a privilege conferred by the law of the place where the acts occurred. Restatement, Conflict of Laws § 382(2); Goodrich, Conflict of Laws § 94 (1939). In the second place, it is well-established that the courts of one state will not determine the validity of the acts of a foreign sovereign done within its borders. Underhill v. Hernandez, 1897, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456; American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826; Ricaud v. American Metal Co., 1918, 246 U.S. 304, 38 S.Ct. 312, 62 L.Ed. 733; Banco de Espana v. Federal Reserve Bank, 2 Cir., 1940, 114 F.2d 438; Bernstein v. Van Heyghen Freres Societe Anonyme, 2 Cir., 1947, 163 F.2d 246, certiorai denied 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357; Pasos v. Pan American Airways, 2 Cir., 1956, 229 F.2d 271. These precedents have not involved the acts of trade-mark officials of foreign countries, but their rationale would appear to extend to that

---

18. When the "practical problems that make trial of a case easy, expeditious, and inexpensive", Gulf Oil Corporation v. Gilbert, 1946, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055, are considered, the Southern District of New York is seen to be an inconvenient forum. Some evidence from American sources would be required, such as proof of plaintiff's American advertising spilling over into Canada. But most of the issues of fact, such as defendant's and plaintiff's respective use of the trade-mark "Vanity Fair" in Canada; defendant's non-use of the trade-mark for a period of years; defendant's resumption of use in 1953, etc., are issues on which the witnesses and proof would be more readily available in Canada. If it be thought that dismissal is too harsh a disposition of a case such as this, it should be remembered that the trial court has power to dismiss on condition that the defendant stipulate to waive the statute of limitations *pro tanto*. The courts of other countries will ordinarily recognize such a stipulation, and the plaintiff is thus assured of a remedy elsewhere.

situation. Moreover, in George W. Luft v. Zande Cosmetic Co., 2 Cir., 1944, 142 F.2d 536, certiorari denied 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606, we assumed the validity of foreign trade-mark registrations in holding that the lower court could not enjoin an American manufacturer from labeling his product with an infringing mark in the United States for shipment to foreign countries in which he had a presumably valid registered trade-mark. "We do not see upon what 'principles of equity' a court can enjoin the initiation of acts in the United States which constitute no wrong to the plaintiff in the country where they are to be consummated. Nor can we perceive upon what theory a plaintiff can recover damages for acts in the United States resulting in a sale of merchandise in a foreign country under a mark to which the defendant has established, over the plaintiff's opposition, a legal right of use in that country. Consequently neither the injunction nor the accounting should cover activities of the defendants, either here or abroad, concerned with sales in countries where the defendants have established rights superior to the plaintiff's in the name 'Zande.'" 142 F.2d at page 540.

■ Were this merely a transitory tort action in which disputed facts could be litigated as conveniently here as in Canada, we would think the jurisdiction of the district court should be exercised. But we do not think it the province of United States district courts to determine the validity of trade-marks which officials of foreign countries have seen fit to grant. To do so would be to welcome conflicts with the administrative and judicial officers of the Dominion of Canada. We realize that a court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere.[19] But this power should be exercised with great reluctance when it will be difficult to secure compliance with any resulting decree or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country.[20]

■ The district court, therefore, did not abuse its discretion in refusing to entertain the claims of trade-mark infringement and unfair competition occurring in Canada. Were it not for the fact that plaintiff did not press its American claims, and they appear to be of somewhat minor significance, we would think it improper to dismiss the entire complaint, since we think that the claims of trade-mark infringement and unfair competition occurring in the United States can be clearly ascertained from the complaint.[21] However, under the circumstances, we will affirm the dismissal,

---

19. State of New Jersey v. City of New York, 1931, 283 U.S. 473, 51 S.Ct. 519, 75 L.Ed. 1176; Massie v. Watts, 1810, 6 Cranch 148, 3 L.Ed. 181; The Salton Sea Cases, 9 Cir., 1909, 172 F. 792; Kroese v. General Steel Castings Corporation, 3 Cir., 1950, 179 F.2d 760, 15 A. L.R.2d 1117.

20. The character of the potential difficulties is illustrated by United States v. Imperial Chemical Industries, D.C.S.D.N.Y. 1952, 105 F.Supp. 215, and British Nylon Spinners v. Imperial Chemical Industries [1953], 1 Ch. 19, in which a United States court directed a British corporation to grant immunity under certain patents in Great Britain, and an English court enjoined it from taking that action. The tenderness of Canadian authorities concerning what they consider foreign interference with their domestic concerns is

illustrated by the prompt Canadian legislation which followed attempts by United States courts to subpoena records of Canadian companies for use in a Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, investigation. See footnote to decision below, D.C., 133 F.Supp. 522, 529, note 2.

21. The claims of trade-mark infringement and unfair competition in the United States are predicated upon the following circumstances: (1) defendant's advertising of feminine underwear in the United States under the trade-mark "Vanity Fair" which results from the American circulation of Canadian media of communication; and (2) defendant's mail order sales of feminine underwear into the United States under the trade-mark "Vanity Fair." The issues raised by these allegations are clear and narrow.

but allow plaintiff, if it so desires, to file an amended complaint within thirty days from date of our mandate herein, stating separately the American issues.

Affirmed as modified.