C–CURE CHEMICAL CO., INC.,
Plaintiff,

v.

SECURE ADHESIVES CORP., Olympia
Floor & Wall Tile Co., and Joseph
Schochet, Defendants.

No. CIV–82–289C.

United States District Court,
W.D. New York.

Aug. 29, 1983.

Hedman, Casella, Gibson, Costigan & Hoare, New York City (Thomas M. Gibson, New York City, of counsel), and Mahoney, Berg & Cornell, Buffalo, N.Y. (Henry W. Cornell, Buffalo, N.Y., of counsel), for plaintiff.

Saperston, Day, Lustig, Gallick, Kirschner & Gaglione, Buffalo, N.Y. (Tricia Thomas Semmelhack, Buffalo, N.Y., of counsel), for defendants Secure Adhesives Corp. and Joseph D. Schochet.

Moot & Sprague, Buffalo, N.Y. (Richard F. Griffin, and Michael E. Ferdman, Buffalo, N.Y., of counsel), for defendant Olympia Floor & Wall Tile Co.

CURTIN, Chief Judge.

Plaintiff C-Cure Chemical Company, Inc., has brought this action against Secure Adhesives, Inc., a New York corporation; Olympia Floor and Wall Tile Co., a Canadian company; and Joseph Schochet, a Canadian resident and owner of Secure Adhesives. Plaintiff seeks injunctive and monetary relief under the Lanham Act, 15 U.S.C. § 1125(a), and under New York State law on a variety of trademark, trade dress, trade secret, unfair competition, and contract claims. Before the court is defendant Secure Adhesives' motion to vacate a preliminary injunction initially entered in this case, defendant Olympia's motion to dismiss this action, and plaintiff's motion to reinstate the preliminary injunction.

The relationship between these parties is complex, and it is helpful at the outset to describe their association. In March, 1978, Charles Johansen founded two corporations, the C-Cure Chemical Company, Inc., and C-Cure Products, Inc., in Houston, Texas. Johansen and others acquired the mortar and grout chemical concentrate business of the Pearsall Chemical Company, and through the C-Cure firms, they develop, manufacture, and distribute chemical concentrates. The concentrates are mixed with cement, sand, or other ingredients by local distributors, and the products are ultimately used in setting and grouting ceramic tile.

C-Cure refers to the local distributors who purchase its concentrates as "affiliates" and maintains that there is essentially a licensor-licensee relationship between plaintiff and the distributors. Distributors market the product for sale to retailers, and some of the C-Cure mixed products are sold in packages under the name of "C-Cure," while others are sold under private labels. These local affiliates are located primarily in the southern and the western portions of the United States.

In May of 1980, the assets of C-Cure Products, Inc., were transferred to C-Cure Chemical, Inc., and C-Cure Products is now virtually inactive.

Defendant Joseph Schochet was an employee of defendant Olympia Floor and Wall Tile Co. for many years. Knowing of Olympia's dissatisfaction with its mortar and grout suppliers, he decided to establish Secure Adhesives in 1978 to meet Olympia's mortar and grout requirements. Schochet received a loan from Olympia to establish Secure Adhesives, and he contacted various chemical concentrate supply corporations in the United States, one of which was the Pearsall Company. Whether Pearsall referred Schochet to C-Cure is unclear, but in any event, Schochet ultimately selected C-Cure as his supplier, because this company could supply him with chemical concentrates formulated by the Tile Council of America—which would be acceptable to Olympia (Docket Item 62, Schochet Deposition at 30). Sometime during the summer of 1978, C-Cure Products sent Secure Adhesives a contract to formalize their relationship. This contract was dated June 28, 1978, and was never signed (Docket Item 1, Complaint, Exhibit A).

In August of 1978, Secure Adhesives, Inc., was incorporated in New York as a manufacturer of thin set mortars and grout and related tile products. Schochet became the sole stockholder of Secure Adhesives, and he was later named vice president of Olympia.

Despite the absence of a written contract, Secure Adhesives purchased chemical concentrates from C-Cure Products and C-Cure Chemical Company, commencing in August, 1978, until November, 1981. During this time, C-Cure Products and Secure Adhesives entered into an arrangement whereby Secure would purchase concentrates from C-Cure and then resell the completed product back to C-Cure for sale in New York State. Again, there does not appear to be any contract memorializing this arrangement. The sale of the completed product was made under the name of "C-Cure Products of New York," and the business office was maintained at Secure's offices in Buffalo.

Sales of C-Cure Products in New York were very low, and it is estimated that sales amounted to no more than $4,000.00 per year during the period when C-Cure labeled products were marketed in the State. It is unclear exactly when the agreement terminated, but it was only in effect for a short time, and C-Cure Products of New York ceased marketing products in New York in early 1981 (Docket Item 65, Johansen Deposition, pp. 34–36).

Secure Adhesives terminated its purchases from C-Cure Chemical in November of 1981 after a dispute over the price of chemical concentrates. Since that time, Secure Adhesives has purchased its concentrates from a Canadian corporation, Flextile, Limited.

The vast majority of Secure Adhesives' sales, both during and after its relationship with C-Cure, has been to defendant Olympia Floor & Wall Tile Co., a Canadian company. In fact, Olympia has traditionally purchased anywhere from 95 to 99 percent of all Secure's products, and there are only one or two local distributors of Secure Adhesive products located in the United States. Apparently, these local distributors are found in the Buffalo area.

When Secure Adhesives purchased its chemicals from C-Cure, the finished product was packaged in bags labeled "C-Cure" and either "C-Cure Chemical Co., Inc." or "C-Cure Products." The bags were supplied by C-Cure. Secure Adhesives then exported and sold these products to Olympia, and the bags contained instructions written in both the English and French languages. After ceasing to purchase chemical concentrates from C-Cure, Secure Adhesives has marketed its products under the name "Secure Adhesives." Bags of mortar and grout produced and exported by Secure and sold to Olympia are now labeled "Secure Adhesives," although there is evidence that there is still some stock of C-Cure labeled products for sale in Canada (Docket Item 17, Johansen Affidavit; Docket Item 19, Affidavit of John Carton; Docket Item 20, Affidavit of Andrew Hukowich).

There is no evidence that there are any C-Cure labeled products still for sale in New York State, and plaintiff has sub-

mitted an affidavit which describes the sale and purchase of a bag of "Secure" mortar in Buffalo in April of 1982. Although plaintiff requested and received a bag of "Secure," plaintiff notes that the sales receipt written by sales personnel lists the product as a 50-pound bag of "C-Cure" (Docket Item 11, Affidavit of Henry Cornell).

Defendant Olympia Floor and Wall Tile Co. is a division of a Canadian corporation, Olympia and York Developments Ltd. Olympia has been engaged in the business of selling ceramic tile for some 25 years, and it is the largest supplier of ceramic tile in Canada. Sales by the corporation have averaged well over $50 million (Cdn.) per year. In addition to ceramic tiles, Olympia also sells various glues and adhesives to its customers which are used to install ceramic tiles, and prior to the formation of Secure Adhesives, Olympia purchased its mortar and grout products from a company called "L & M Ceramo."

Although Olympia assisted Schochet in establishing Secure Adhesives, Olympia owns no beneficial interest in Secure, and while the two entities obviously have a close business affiliation, their formal relationship is one of vendor-purchaser (Docket Item 21, Affidavit of Ralph Reichmann). Additionally, it seems clear that Olympia does no business in the United States (Docket Item 109).

In June of 1979, Olympia attempted to register the trademark "C-Cure" with the Canadian Trade Marks Office. On January 23, 1981, the Henkel Corporation filed a statement of opposition to the C-Cure trademark application. Henkel is a Minneapolis-based corporation which sells acrylic resins in the United States and Canada under the name "G-Cure" and advertises this product in both Canadian and American publications. The mark "G-Cure" was registered with the U.S. Patent and Trademark Office on December 18, 1973 (No.

974,741) and with the Canadian Trade Marks Office on May 16, 1980 (No. 244,800). In December of 1981, Olympia decided to abandon its registration efforts (Docket Item 33, Carton Affidavit).[1]

In the course of this litigation, plaintiff discovered that defendant Olympia was selling 4 kilogram boxes of grout labeled "C-Cure" and "Olympia" in Canada during the spring of 1982. Olympia responds that this name was chosen in error and that upon discovery in May of 1982, the packages were voluntarily relabeled under the name "unibond." Olympia admits that some sales of this "C-Cure" labeled grout were made between January and May of 1982 and further admits that it was unable to prevent these sales. Olympia estimates that its sales of this product under the "C-Cure" label totaled less than $10,000 (Cdn.) and that the grout contained in these boxes was "manufactured in Canada, purchased by Olympia in Canada, and sold by Olympia only in Canada" (Docket Item 89, Exhibit A, Affidavit of Marcu Terner). Secure Adhesives also categorically denies that it was in any way involved with the manufacture of this particular product (Docket Item 86, Rich Affidavit; Docket Item 87, Semmelhack Affidavit).

Plaintiff's involvement in Canada is far more limited. C-Cure Chemical itself has made no sales there and places no advertisements in Canadian publications. Nor does it advertise that its products are available in Canada (Docket Item 65, Johansen Deposition, pp. 47–48, 69–70, 76). Further, C-Cure Chemical does not carry on any business in Ontario and has not applied to the Canadian Trade Marks Office for registration of the mark "C-Cure" (Docket Item 65, Johansen Deposition, pp. 8, 76, 87, 151). With the exception of Olympia's aborted sales of 4 kilogram boxes of grout, C-Cure's only apparent connection to Canada is defendant's present use of the trade name

1. Additionally, it also appears that the trademark "Secure" was registered with the Canadian Trade Marks Office on August 7, 1970 (No. 170,486) and is used to describe "a water-type sealer finish for all types of floors." The regis-

trant is S.C. Johnson & Son, Inc., of Racine, Wisconsin, and it is not clear if this trademark is registered in the United States (Docket Item 33, Carton Affidavit).

"Secure Adhesives" and through the sale of its chemical concentrates to Secure Adhesives and the export and sale of the finished product labeled "C-Cure" in Canada between 1978 and 1981.

After filing this action, plaintiff brought a motion for a preliminary injunction, and defendant Secure moved to dismiss the action. Defendant's motion was denied, and on July 12, 1983, the court considered plaintiff's motion. Based upon the information presented by the parties, the court found that plaintiff had not met its burden for a preliminary injunction concerning Secure Adhesives' use of chemical concentrates now supplied by Flextile or the use of various quality control symbols printed on Secure Adhesives' bags.

Concerning Secure's trade name and some aspects of trade dress, however, the court found that C-Cure had sufficiently demonstrated secondary meaning. There are minor differences in layout and design between the C-Cure and Secure packages, and the instructions printed on the packages are virtually identical. There is also an undeniable similarity between the two names when they are pronounced. Under these circumstances, and also because of the prior business relationship between C-Cure and Secure Adhesives, the court found that "the conscious imitation of plaintiff's trade dress is sufficient to support a presumption that the substantial similarity will cause customer confusion." *C-Cure Chemical Co., Inc. v. Secure Adhesives, Inc. and Olympia Floor and Wall Tile Co.,* Civ. 82–289C (W.D. N.Y. July 12, 1982), p. 9.

As a result, the court ordered Secure to immediately begin to design a new trade dress, adopt a new trade name, and cease manufacturing packages bearing the name "Secure." Some five days later, defendant Secure Adhesives moved to vacate the preliminary injunction.

Secure's motion to vacate was initially based upon the deposition of Charles Johansen, taken as part of the proceedings commenced by C-Cure Chemical against Olympia in the Supreme Court of Ontario. Secure argued that this new information was not available to this court when the preliminary injunction was entered. At oral argument on the motion to vacate, Secure Adhesives challenged C-Cure Chemical's trade dress ownership, C-Cure's claims of $22 million in annual sales, the relationship of plaintiff to its affiliates, whether C-Cure had established secondary meaning, and C-Cure's possible unclean hands in its relationship to the Tile Council of America [TCA]. On July 23, 1982, the court directed the parties to submit additional briefs and affidavits concerning these issues. On July 26, 1983, the court stayed the preliminary injunction entered on July 12, 1982. The court also requested the parties submit additional briefs and affidavits concerning Olympia's motion to dismiss plaintiff's Lanham Act count and the remaining counts based upon the doctrine of *forum non conveniens.*

There are some additional facts concerning the procedural posture of this case which also deserve brief mention. In plaintiff's Canadian action, C-Cure Chemical moved for a preliminary injunction against Olympia, and the Honorable Judge Smith of the Supreme Court of Ontario ordered that Olympia be restrained from

> the sale, distribution, use, etc. of the word "Secure" or any similar word and also any trade dress or get-up or wording on bags or packages such as were exhibited as evidence that may deceive or cause confusion.

(Docket Item 102, Order of November 22, 1982).

Defendant was granted leave to appeal on January 31, 1983, and on April 14, 1983, the Divisional Court of the Supreme Court of Ontario determined that plaintiff had failed to demonstrate irreparable harm, and therefore, the "balance of convenience" did not favor C-Cure. The court stated that "plaintiff has failed completely to show that he is suffering any injury or any real likelihood in the future." (Docket Item 105.)

The court notes that documents concerning the status of the Canadian litigation were submitted by the parties and that

"when trade-mark rights within the United States are being litigated in an American court, the decisions of foreign courts concerning the respective trade-mark rights of the parties are irrelevant and inadmissible." *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir.1956), *cert. denied*, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956), *citing George W. Luft Co. v. Zande Cosmetic Co.*, 142 F.2d 536, 539 (2d Cir.), *cert. denied*, 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944). Accordingly, this court is bound to disregard the Ontario courts' decisions concerning the rights of the parties when considering their trademark rights within the United States.

On April 19, 1983, the United States Patent and Trademark Office determined that the stylized name "C-Cure" was entitled to registration for describing "mortars and grouts and grouting ceramic tiles on walls and floors" sold by the C-Cure Chemical Co., Inc. (No. 1,235,292) (Docket Item 107). Secure Adhesives has informed the court that it filed a petition with the Trademark Trial and Appeal Board on April 29, 1983, seeking cancellation of plaintiff's federal trademark registration (Docket Item 108).

With these additional factors in mind, we now turn to the pending motions.

*Preliminary Injunction*

■ In order for a preliminary injunction to issue in trademark infringement actions, there must be a showing of (a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in toward the party requesting preliminary relief. *Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 78 (2d Cir.1981). In this respect, the critical issue to be determined is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). In the

context of a preliminary injunction, a showing of a likelihood of confusion as to the source or sponsorship establishes the required likelihood of success on the merits as well as the risk of irreparable harm. *Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir. 1982).

■ To determine the likelihood of confusion and in balancing the equities, the court must consider the factors discussed in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The United States Court of Appeals for the Second Circuit has recently indicated that this type of analysis should be applied to situations involving both noncompeting and competing goods. *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir.1981). These factors are:

(1) The strength of the plaintiff's mark;

(2) The degree of similarity between the two products;

(3) The proximity of the products;

(4) The likelihood that plaintiff will bridge the gap;

(5) Actual confusion;

(6) The defendant's good faith;

(7) The quality of the defendant's product; and

(8) Sophistication of the buyers of the product.

*(1) Strength of Plaintiff's Mark*

■ The United States Court of Appeals for the Second Circuit has determined that

The term "strength" as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.

*McGregor-Doniger, Inc.` v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). In cases where the mark is registered, it is "presumptively distinctive," and the user need not prove secondary meaning. *Id.* Rather, defendants have the burden of affirmative-

ly demonstrating that the mark is generic. *Id.* In the instant case, the recent decision of the Patent and Trademark Office to register plaintiff's mark demonstrates that the mark is "presumptively distinctive." Defendants have not demonstrated that plaintiff's trade name has "[come] to signify to the public the generic name of an article rather than the source of a particular brand of that article." *Id.*

Thus, Secure Adhesives' many arguments concerning the amount of plaintiff's sales, its advertising, and the use of the C-Cure name by C-Cure's affiliates, as well as trade dress ownership, are unavailing. In addition, the court reaffirms its finding that plaintiff has made a sufficiently strong showing of secondary meaning concerning plaintiff's trade dress. *See C-Cure Chemical Co., Inc. v. Secure Adhesives, Inc. and Olympia Floor and Wall Tile Co.,* Civ. 82–289C (W.D.N.Y. July 12, 1982, p. 10). Nevertheless, the court must consider all factors bearing on the likelihood of confusion.

*(2) Similarity of the Marks*

The close similarity of the marks "C-Cure" and "Secure Adhesives" is not dispositive of the issue of likelihood of confusion. "Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question." *McGregor,* 599 F.2d at 1133, *quoting* R. Callman, "The Law of Unfair Competition, Trademarks, and Monopolies," § 82.1(a) (1969) at 601–02 (footnote omitted). In analyzing this factor, the test must be applied from the perspective of the prospective purchaser. *Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1197 (S.D.N.Y.1983). Another principle in this analysis is the degree of similarity based upon the overall impression upon the consumer.

> [I]t is sufficient if the *impression* which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trademark.

*McGregor,* 599 F.2d at 1134, *quoting Stix Products, Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 494 (S.D.N.Y.1968).

In this case, if prospective purchaser confusion exists, both C-Cure and Secure Adhesives must each bear some responsibility for the confusion. By adopting C-Cure's instructions and printing these instructions on the front of its packages, Secure Adhesives' trade dress bears a remarkable similarity to C-Cure's packaging. The Second Circuit has noted in this respect that "the overall packaging context is especially important." *Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 257 (2d Cir.1982).

The court notes, however, that defendants' bags are clearly labeled "Secure Adhesives," and the stylization as well as the typefaces used by C-Cure and Secure are different in connoting their trade names. The Second Circuit has also stated that it is appropriate for the court to consider the differences in the typeface of the two marks. *Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons,* 523 F.2d 1331, 1339 (2d Cir.1975). Another factor is that C-Cure and Secure Adhesives both present their marks in association with their company names, which reduces the likelihood of confusion. *Vitarroz v. Borden, Inc.,* 644 F.2d 960, 969 (2d Cir.1981).

Nevertheless, auditory confusion is virtually inevitable. *C-Cure Chemical Co. v. Secure Adhesives Corp.,* Civ. 82–289C, pp. 7–8 and n. 2 (W.D.N.Y. July 12, 1982); *Grotrian, Helfferich, Schulz, etc. v. Steinway & Sons, supra* at 1340, and some likelihood of confusion may be inferred from the various affidavits and sales receipts submitted by the plaintiff, who, having purchased Secure Adhesive Products, received receipts for "C-Cure" products from various merchants in Buffalo and Ontario. Yet, the sales receipts themselves are not the "infringing product" in this case.

The court also notes that the risk of confusion to prospective purchasers is greatly lessened by the fact that purchasers would find it very difficult to obtain C-Cure labeled products in Canada or New York, because C-Cure products are no longer mar-

keted or sold in either area. Further, the extremely low volume of C-Cure labeled product sales in New York State between 1978 and 1981 and plaintiff's decision to abandon the New York State market is some indication of the lack of prospective purchaser awareness of the product. Coupled with this factor is Secure Adhesives' own extremely low volume of sales in New York State. Additionally, the court notes that plaintiff does not advertise in Canada or elsewhere that its products are available in Canada (Docket Item 65, Johansen Affidavit). While there is evidence that old C-Cure stock manufactured by Secure and sold by Olympia is still available for purchase in Canada, there is no indication that this is true in New York.

Thus, any confusion to prospective purchasers would seem to occur when these purchasers attempted to obtain formerly available C-Cure products and received Secure products instead, believing that they had purchased C-Cure products. Nevertheless, there is no evidence that this confusion has occurred (*see* discussion, *infra*), and if such confusion exists, plaintiff has also contributed to this type of confusion.

In several advertisements placed in trade magazines in 1981, C-Cure Chemical stated "Secure your job with C-Cure Adhesives," although C-Cure labeled products are sold in bags with the trademark "C-Cure" in bold letters followed directly underneath by "C-Cure Chemical Co., Inc." (Docket Item 4, Exhibit F; Docket Item 82, Exhibit H). In the January 1982 edition of *Tile Letter,* the February 1982 edition of *Flooring,* the March 1982 editions of *Western Floors* and *Tile and Decorative Surfaces,* and the August 1982 edition of *Tile and Decorative Surfaces,* plaintiff placed advertisements which stated in bold letters "The C-Cure™ [sic] Network Coast-to-Coast, and Close to You," followed by two descriptive paragraphs which began, "There is a C-Cure Manufacturing Facility Close to You." Listed among plaintiff's "manufacturing affiliates" was "Secure Adhesives, Buffalo, New York" (Docket Item 4, Exhibit F; Docket Item 82, Exhibit I). Plaintiff has not explained why Secure Adhesives was

included as an affiliate and as part of the C-Cure "network" in these advertisements when in fact the relationship between the two corporations terminated in 1981. As a result, risk of confusion to prospective purchasers must be shared, at least in part, by the plaintiff.

In balancing the equities for this factor, because C-Cure Chemical Co. does not market its products in Canada or New York or advertise in Canada, and taking into account the small amount of sales of Secure Adhesives in the United States, the similarity does not seem likely to provoke confusion from the perspective of the prospective customer. *See Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. at 1198 (where the products are competitive, the likelihood of confusion increases). If such confusion exists, both parties must share in the responsibility for creating this confusion.

### (3) Proximity of the Products and (4) Bridging the Gap

Although side-by-side competition is irrelevant to a claim under the Lanham Act or New York State Unfair Competition law when two competing product lines are involved, some demonstration that C-Cure products are being sold in the same country or city is necessary to establish that the same market is involved. *Paco Rabanne Parfums S.A. v. Norco Enterprises,* 680 F.2d 891, 893 (2d Cir.1981). It

> seems clear that a trademark infringement will not be found unless confusion as to the source of goods exists in the market area served by the plaintiff or in an area into which plaintiff is reasonably likely to expand.

*Unicure, Inc. v. Nelson,* 502 F.Supp. 284, 287 (W.D.N.Y.1980).

In *Dawn Donut Company v. Hart's Food Stores, Inc.,* 267 F.2d 358 (2d Cir.1959), the court considered the question of markets and both the plaintiff and the defendant's use of the word "Dawn" in connection with their retail sale of baked goods. Plaintiff owned and federally registered the trade-

marks "Dawn" and "Dawn Donuts." However, the court determined that

> if the use of the marks by the registrant and the unauthorized user are confined to two sufficiently distinct and geographically separate markets, with no likelihood that the registrant will expand his use into defendant's market, so that no public confusion is possible, then the registrant is not entitled to enjoin the junior user's use of the mark.

*Id.* at 364 (footnote omitted). *See also Continente v. Continente,* 378 F.2d 279, 282 (9th Cir.1967); *American Foods, Inc. v. Golden Flake, Inc.,* 312 F.2d 619, 626 (5th Cir.1963).

In the instant case, plaintiff no longer sells its products in New York State and has never carried on business in Ontario. Apparently, it has no present intention to sell any of its products in Canada. Nor has C-Cure made any claim that it could be reasonably expected to extend its marketing into defendants' trading area. Indeed, from the facts presented, there is no indication that C-Cure intends to enter the Canadian market, and it appears to have forsaken the New York State market due to poor sales.

The element of "bridging the gap" of the *Polaroid* test is directed at C-Cure's interest in preserving the possibility that it might one day in the future expand into the market Secure Adhesives now occupies, using the "C-Cure" mark. *Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d at 258. While C-Cure has not directly addressed this element, based on the past and current use of C-Cure Products in New York and Canada, this possibility seems remote.

### (5) Actual Confusion and (8) Sophistication of Purchasers

■ Actual confusion is one of the factors which must be considered in determining the likelihood of confusion between the two products. *McGregor,* 599 F.2d at 1136; *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d at 495. Additionally, courts must consider the level of sophistication of relevant purchasers in making their purchasing decisions, and the degree of reliance by consumers on labels or trademarks will vary from product to product, as each product has its own separate threshold for confusion of origin. *McGregor,* 559 F.2d at 1137.

C-Cure's president, Charles Johansen, traveled to Toronto, Hamilton, and London, Ontario, in the spring of 1982 and requested various C-Cure products from Olympia facilities located in these cities. His efforts met with varying degrees of success, for in each instance, he received some C-Cure products, some Secure Adhesives Products, and a bag of Pearsall Superwhite Grout, truly a mixed bag (Docket Item 17, Johansen Affidavit). Plaintiff's additional efforts to purchase C-Cure labeled products in Toronto and Ottawa met with similar results, although there apparently was no superwhite grout available for sale at the Ottawa store (Docket Item 19, Affidavit of John Carton; Docket Item 20, Affidavit of Andrew Hukowich).

Olympia explains that plaintiff's purchases of C-Cure labeled products, Secure Adhesives products, and Pearsall products were the sales of existing labeled merchandise from Olympia's inventory stock. Defendant responds to these purchases with the statement that, "Our customers buy mortar and grout which we have in stock, and frankly, they couldn't care less about the name which appears on the bag." (Docket Item 21, Affidavit of Ralph Reichman.)

Two affidavits submitted on behalf of defendants by Ontario Tile contractors tend to confirm this practice (Docket Items 46 and 47). These affidavits reveal that tile contractors "never request a product by a brand or trade name" but rather order products by generic names and identify products by generic name. When ordering supplies, contractors apparently "accept whatever grout, mortar, glue, adhesives, or similar accessory products Olympia happens to have in stock at the time of the particular purchase."

The court is mindful that in assessing consumer confusion, the "assumptions of the typical consumer, whether or not they match reality, must be taken into account." *McGregor,* 599 F.2d at 1136. While there

may be some actual confusion in the Canadian markets between C-Cure's and Secure Adhesives' products presently, it also seems that this confusion stems from the sale of remaining stock of C-Cure labeled products which were produced by Secure Adhesives under agreement with the plaintiff.[2] This may also explain the sale of Pearsall products, plaintiff's predecessor. Since C-Cure labeled products are no longer produced for sale in Canada or in New York State, and since C-Cure does not intend to sell its products in these markets, this confusion can only be viewed as temporary. Under these circumstances, the remaining sales of C-Cure labeled products in Canada seem "too slight to bring the case above the role of de minimus." *McGregor,* 599 F.2d at 1138, *quoting Triumph Hosiery Mills v. Triumph International Corporation,* 308 F.2d 196, 199 (2d Cir.1962).

The willingness of both plaintiff and Ontario tile contractors to accept products purchased from Olympia regardless of the brand name is indeed curious. The affidavits submitted by defendants indicate a complete disregard for product names when orders are filled by sales personnel for mortar and grout supplies. Thus, "[t]he remote possibility of occasional confusion in those who observe less than ordinary care under the circumstances does not concern us." *McGregor,* 599 F.2d at 1138, *quoting Modular Cinemas of America, Inc. v. Mini Cinemas Corp.,* 348 F.Supp. 578, 582 (S.D.N.Y. 1972). From the facts presented to date, it is difficult to see how either of these two factors favor the plaintiff.

*(6) Defendants' Good Faith*

 When an infringing mark is identical to a registered mark and both marks are used to describe similar products, the burden lies with the defendant to carry the burden of explanation and persuasion. *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1101 (2d Cir.1969), *cert. dismissed,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970). If the defendants acted in good faith in adopting their trade dress and trademark, it is a strong argument against a finding of infringement. If, however, the defendants have "adopted the mark in bad faith, the equitable balance is tipped singularly in favor of a finding of infringement." *Narwood Productions v. Lexington,* 541 F.Supp. 1243, 1252 (S.D.N.Y. 1982); *Lambda Electronics Corp. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 929 (S.D. N.Y.1981).

From the facts presented to date, it would appear that Joseph Schochet and Charles Johansen adopted the names "Secure Adhesives" and "C-Cure" at almost the same time. Schochet had no knowledge of C-Cure when he began to establish his business, and ultimately, Schochet chose to purchase chemical concentrates from C-Cure, because these products would be mixed under Tile Council of America formulae (Docket Item 62, Deposition of Schochet). C-Cure Products and C-Cure Chemical were incorporated in April of 1978, and there exists the unsigned contract dated June 28, 1978, between "C-Cure Products Co., Inc." and "Secure Adhesives Incorporated." The proximity of dates between the establishment of C-Cure and the date of this contract tends to support Secure Adhesives' good faith efforts in adopting its trade name.

Further, despite the lack of a formal agreement between C-Cure and Secure Adhesives, defendant was permitted by plain-

---

2. The parties also seem to be confused about their relationship. George Gal, an employee of Olympia, attended a trade show in Detroit, Michigan, in September of 1982, where representatives of C-Cure Chemical Company were also exhibiting their products. C-Cure claims that Mr. Gal stated that "he was a customer of C-Cure Chemical Co." and that he was "very happy with the product" (Docket Item 76, Affidavit of Richard Doty). Gal claims that he was approached by Ernest Hollas, vice president of C-Cure, and that upon discovering that Gal worked for Olympia, Hollas said, "Oh! We deal with you guys." (Docket Item 89, Exhibit A, Affidavit of George Gal.) Concerning the instant motion, the critical issue is not whether employees of the parties are confused, but rather whether ordinary and prudent purchasers will be confused as to the sources of goods in question. *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d at 47.

tiff to manufacture and distribute under the name "Secure" without any agreement that the practice would be discontinued (Docket Items 65 and 81, Deposition of Johansen). Thus, based on the limited discovery to date, it would seem that there has been no deliberate intent by Secure Adhesives to trade on plaintiff's good will by selecting a name designed to suggest an association with plaintiff. *Exxon Corp. v. Xoil Energy Resources, Inc.,* 552 F.Supp. 1008, 1022 (S.D.N.Y.1981).

Whether the same can be said of Secure Adhesives' trade dress is another matter. As previously stated, the instructions contained on the Secure packages is virtually identical to those packages presently used by C-Cure affiliates. Indeed, the present Secure instructions are also virtually identical to the C-Cure instructions which were printed on bags containing mortar and grout produced under the C-Cure-Secure agreement between 1978 and 1981. Defendant Secure has never adequately explained this similarity, except to argue that all mortar and grout instructions are similar in wording and form and that its trade dress is "functional" (Docket Items 64 and 79). This is not a persuasive explanation, and an intent of bad faith may be inferred. *See Spring Mills, Inc. v. Ultracashmere House Ltd.,* 689 F.2d 1127, 1134–35 (2d Cir. 1982).

*(7) Quality of Defendants' Product*

When Secure Adhesives ceased purchasing chemical concentrates from C-Cure, Secure hired Dr. George Seldon to develop new formulae for its chemical ingredients. Secure now purchases these chemical concentrates from Flextile (Docket Item 8, Affidavit of Dr. George Seldon). There is no indication that defendant Secure Adhesives' present product is of any different quality than its former product made with C-Cure chemical concentrates.

*(9) Additional Considerations*

Defendant Secure Adhesives claims that plaintiff is guilty of "unclean hands" in requesting this injunction. Secure argues that C-Cure's predecessor, Pearsall, entered into a consent judgment with the Tile Council of America in the Superior Court of New Jersey in May of 1971. This judgment enjoins Pearsall and its successors and assignees from selling chemical concentrates patented by the Tile Council of America to "anyone who is not licensed under a TCA mortar and grout license" (Docket Item 82, Exhibit C).

Secure Adhesives argues that C-Cure is a successor to Pearsall and that each of plaintiff's chemical concentrate distributors (both affiliates and distributors marketing mortar and grout products under private labels) sign an agreement whereby C-Cure Products Co. or C-Cure Chemical Co. will pay on behalf of the distributor a $5,000.00 license fee to the TCA. The agreements also state that this fee is paid pursuant to the Superior Court of New Jersey consent judgment (*see* Docket Item 72, Affidavits of C-Cure manufacturing affiliates).

Secure Adhesives notes that this same language concerning the payment of the $5,000.00 license fee to the TCA pursuant to Superior Court of New Jersey judgment was contained in the proposed agreement submitted by C-Cure to Secure in the summer of 1978 (Docket Item 1, Exhibit A). Since this agreement was never signed by C-Cure and Secure Adhesives, defendant suspects that the license fee to the TCA was never paid and that plaintiff violated the terms of the consent judgment by selling chemical concentrates to Secure Adhesives from 1978 to 1981.

Plaintiff argues that the question of licenses and fees paid to the TCA is irrelevant to the motion before the court. Failing this, plaintiff suggested at oral argument that some TCA patents may have expired, and therefore, the payment of any fees to the TCA on behalf of Secure Adhesives may have been unnecessary.

This court has stated that the doctrine of unclean hands "will be applied 'only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect to the matter in litigation.'" *Markel v. Scovill*

*Mfg. Co.,* 471 F.Supp. 1244, 1255 (W.D.N.Y. 1979). *See also U-Haul International, Inc. v. Jartran, Inc.,* 522 F.Supp. 1238, 1254–55 (D.Ariz.1981). Of significance here are not the contents *in* the packages, but the trade name and trade dress printed *on* the packages. Although it would appear that Secure Adhesives selected plaintiff's chemical concentrates for purchase because these concentrates were developed according to TCA formulae, and the quality of defendants' products is a factor to be considered in the *Polaroid* analysis, defendants have not adequately demonstrated how the relationship of plaintiff's possible violation of the Pearsall decree affects defendants' use of its trade dress and trade name to invoke the unclean hands defense.

### Conclusion Concerning Motion for Preliminary Injunction

■ The issues presented in this case have proven vexing for courts to consider. As in most trademark cases, the court is not struck immediately with the rightness of one party's position. Plaintiffs have demonstrated the strength of their mark and trade dress, and defendant Secure Adhesives has failed to demonstrate that it adopted its trade dress in good faith. Yet, all the relevant factors must be considered in determining whether a likelihood of confusion exists, and no one factor is determinative. Additionally, a preliminary injunction "is an extraordinary and drastic remedy [that] should not be routinely granted." *Medical Society of the State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977).

■ In the instant case, because the risk of confusion to prospective purchasers appears minimal, because plaintiff and defendant's products are not sold in the same countries or geographic markets, and because the actual confusion to purchasers seems *de minimus,* the court believes that plaintiff has not sufficiently demonstrated a likelihood of confusion to an appreciable number of purchasers to warrant the reinstatement of a preliminary injunction. Plaintiff has not shown that it intends to enter the Canadian market or reenter the New York market in the future. Addition-

ally, from the facts that have been presented concerning the sophistication of Ontario mortar and grout purchasers, there does not seem to be any reliance on trademark and labels in determining their purchasing decisions. Accordingly, for these reasons, defendants' motion to vacate the preliminary injunction is granted.

■ As plaintiff cannot show a likelihood of confusion, its claim under section 368–d of the New York General Business Law for a preliminary injunction must also be denied. *Warner Bros., Inc. v. American Broadcasting Companies, Inc.,* 530 F.Supp. 1187, 1197 (S.D.N.Y.1982).

### Jurisdiction over Defendant Olympia

Defendant Olympia asserts that this court lacks jurisdiction to consider plaintiff's Lanham Act claim asserted against it and that the court should dismiss the remaining state law and common law claims on the basis of *forum non conveniens.*

Plaintiff has conceded that section 368–d of the New York State General Business Law does not apply to Olympia.

### Lanham Act Jurisdiction

■ In *Vanity Fair Mills v. T. Eaton Company,* 234 F.2d at 642, the court stated the factors to be considered for determining Lanham Act jurisdiction over a Canadian or other foreign corporation. These factors are derived from the Supreme Court's decision in *Steele v. Bulova Watch Co.,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952), and they remain the law of this circuit. *American White Cross Laboratories, Inc. v. H.M. Cote, Inc.,* 556 F.Supp. 753, 757 (S.D.N.Y. 1983). The factors to be considered are: (1) Whether the defendants' conduct has a substantial effect on United States Commerce; (2) Whether the defendant is a citizen of the United States; and (3) Whether there exists a conflict with trademark rights under foreign law.

Defendant Olympia readily admits that it purchases its products from Secure Adhesives; yet, it maintains that these activities do not have a "substantial" effect upon U.S. commerce. Defendant relies on *Vanity*

*Fair Mills,* where the court found that the Canadian defendant's office in New York City and defendant's small number of mail order sales to United States customers were not sufficient to have a "substantial" effect on commerce here.

In *Bulova Watch Co. v. Steele,* 194 F.2d 567 (5th Cir.1952), *aff'd,* 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952), the court noted that the trademark infringing watches produced and sold in Mexico were made from watch cases and dials exported from the United States. The court determined that the purchase of these watch parts had a "substantial effect" on foreign commerce, over which Congress intended to exercise its authority in enacting the Lanham Act. *Id.* at 570–71.

In this case, there are several different aspects of Olympia's possible effect on U.S. commerce. First, Olympia loaned Schochet the funds to establish Secure Adhesives. Second, Olympia presently purchases the allegedly infringing products from Secure Adhesives, a New York corporation. Third, Secure Adhesives now purchases its chemical concentrates from a Canadian corporation, Flextile, Ltd. Although Olympia describes Flextile as a separate and distinct corporate entity, the stock of Flextile is owned by Olympia (Docket Item 21, Reichman Affidavit). These business dealings indicate that Olympia's conduct has a substantial effect on U.S. commerce. *See Vanity Fair Mills v. T. Eaton Company,* 234 F.2d at 642. Nevertheless, the application or absence of one of these factors to Olympia is not dispositive of Lanham Act jurisdiction. *See American Rice, Inc. v. Arkansas Rice Growers,* 701 F.2d 408, 414 (5th Cir.1983).

Concerning the second factor, both plaintiff and defendants agree that Olympia is not a United States citizen (Docket Items 109 and 110).

■ In turning to the third factor, there is clearly a potential for conflict with Canadian trademark law. Plaintiff has initiated lawsuits against Olympia in this court, as well as the Supreme Court of Ontario. Plaintiff requests that Olympia be enjoined from using the name "Secure" or "Secure Adhesives" in both actions, and in this court, plaintiff requests damages be awarded against Olympia for trademark infringement in Canada. When trademark rights within the United States are litigated in American courts, foreign court decisions are irrelevant. *Vanity Fair Mills,* 234 F.2d at 639.

> Similarly, the rights and liabilities of United States citizens who compete with foreign nationals in their home countries are ordinarily determined by the appropriate foreign law. *Ingenohl v. Olsen & Co.,* 273 U.S. 541, 544 [47 S.Ct. 451, 452, 71 L.Ed. 762] (1927).

*Id.*

Some indication of the possible conflicts with Canadian trademark law can be readily demonstrated. If Olympia is ultimately successful in defending the use of the trademark "Secure Adhesives" in the Supreme Court of Ontario, and if plaintiff is successful in litigating its trademark rights in the United States, this court cannot enjoin the American manufacturer, Secure Adhesives, from labeling its product with an infringing mark in the United States for shipment to Canada. *Vanity Fair Mills,* 234 F.2d at 633; *George W. Luft v. Zande Cosmetic Co.,* 142 F.2d at 540.

■ The clear import of *Vanity Fair Mills* is that the Lanham Act should not be applied to a foreign citizen allegedly committing infringing acts in his or her home country. *Miller Brewing Co. v. Carling O'Keefe Breweries,* 452 F.Supp. 429, 442 (W.D.N.Y.1978), and for the reasons herein stated, the court declines to apply any extraterritorial application of the Lanham Act to defendant Olympia. Defendants' motion to dismiss this claim is granted.

*Forum Non Conveniens*

■ Absent subject matter jurisdiction under the Lanham Act, Olympia suggests that the remaining causes of action be dismissed on the basis of *forum non conveniens.* A determination of *forum non conveniens* is committed to the discretion of

the court. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981).

In *Gulf Oil v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), the Supreme Court stated that "unless the balance [of convenience] is strongly in favor of the defendant the plaintiff's choice of forum should rarely be disturbed." Nevertheless, "[a]n American citizen does not have an absolute right under all circumstances to sue in an American court." *Vanity Fair Mills,* 234 F.2d at 645. The test to determine whether a motion for *forum non conveniens* should be granted begins with a determination as to whether an alternative forum exists. *See Piper Aircraft v. Reyno,* 454 U.S. at 242, 102 S.Ct. at 259. In this case, it has been amply demonstrated that an alternative forum in Canada exists for plaintiff to litigate this matter.

After making this determination, the court is to analyze private factors which involve "advantages and obstacles to a fair trial." These factors include relative ease and access to sources of proof, availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining willing witnesses, and all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Gulf Oil v. Gilbert,* 330 U.S. at 508–09, 67 S.Ct. at 843; *Alcoa Steamship Co., Inc. v. M/V Nordic Regent,* 654 F.2d 147, 151 n. 4 (2d Cir.1981).

The private factors here point strongly to Ontario as the appropriate forum. Both plaintiff and defendants would find themselves geographically closer to sources of proof in Ontario. The potential and actual purchasers of the product all reside in Canada, there is no compulsory process for demanding their presence in this court, even if this were a criminal matter. Further, based upon the affidavits and depositions which have been conducted in the Canadian litigation and submitted here as part of the record, the status of the Canadian litigation may well be further advanced than in the instant case. To date, there has been significant duplication of legal efforts on behalf of all the parties on both sides of the

border. This factor weighs strongly in defendant's favor.

From the standpoint of the second factor, public interest, the court may consider administrative difficulties that follow from court congestion, a local interest in having controversies decided at home, and the avoidance of unnecessary problems in conflicts of laws and in law foreign to the forum. *See Alcoa Steamship Co., Inc. v. M/V Nordic Regent,* 453 F.Supp. 10, 11 (S.D.N.Y.1978), *aff'd,* 654 F.2d 147 (2d Cir. 1981). The court congestion in this district is well known to the parties involved in this case, and it may well be a "grand waste of efforts by both the courts and the parties in litigating the same issues in two forums at once." *Microsoftware Computer Systems v. Ontel Corp.,* 686 F.2d 531, 538 (7th Cir.1982) (Doyle, J., dissenting).

Preliminary choice of law analysis indicates that this litigation would require the application of Canadian substantive law to plaintiff's claims against Olympia. This court has had some experience in applying Canadian law to certain issues presented by litigants in the past. This experience does not mean that the application of Canadian law has become any easier over time; rather, it confirms the Supreme Court's recent statement that the need for application of foreign law points toward the dismissal of the action. *Piper Aircraft Co. v. Reyno,* 454 U.S. 260, 102 S.Ct. at 268.

Plaintiff suggests that because there is no Lanham Act count in its Canadian litigation, and because Canadian courts may not entertain a Lanham Act-type count, this court should deny Olympia's motion. The Supreme Court has stated that an unfavorable change in the law may be a relevant consideration when considering a motion to dismiss on the basis of *forum non conveniens,* but only when the remedy in the alternative forum "is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft Co. v. Reyno,* 454 U.S. at 254 and n. 22, 102 S.Ct. at 265 and n. 22. In trademark actions, Canadian courts are clearly not within this category of fora. *See Vanity Fair Mills,* 234 F.2d at 646.

Finally, the court notes that Olympia has not actually consented to personal jurisdiction in this action but claims that it has only agreed to "not controvert it" (Docket Item 111, note 2). Even if personal jurisdiction over Olympia were established, any order enjoining Olympia must be

> exercised with great reluctance when it will be difficult to secure compliance with any resulting decree or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country.

*Vanity Fair Mills,* 234 F.2d at 647.

For these reasons, defendant Olympia's motion to dismiss plaintiff's complaint against it based upon *forum non conveniens* is granted.

### Primary Jurisdiction

The recent federal registration of plaintiff's mark "C-Cure" on April 19, 1983 (No. 1,235,292, Docket Item 107) and defendant Secure Adhesives' filing of a cancellation proceeding before the Trademark Trial and Appeal Board on April 29, 1983 (Docket Item 108) presents an interesting question of primary jurisdiction.

 Primary jurisdiction is a doctrine which

> comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. Western Pacific Railway Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). It is a flexible concept, and there is no fixed formula for applying the doctrine. Further, application of primary jurisdiction principles is discretionary and depends upon the facts of each individual case. *Board of Education of the City School District of New York v. Harris,* 622 F.2d 599, 606 (2d Cir.1979).

Some courts have noted that when registration decisions of the Patent and Trademark Office are litigated in district court pursuant to 15 U.S.C. § 1071(b), the court proceeding is "virtually *de novo,* since additional cross-examination and presentation of additional testimony is permitted. *Continental Connector Corp. v. Continental Specialties Corp.,* 413 F.Supp. 1347, 1350 (D.Conn.1976). In some cases, courts have determined that the interests of judicial economy outweighed the doctrine of primary jurisdiction in allowing the Patent and Trademark proceedings to reach a decision and suspending the district court litigation until that time. *See Continental Connector Corp. v. Continental Specialties Corp.,* 413 F.Supp. at 1350; *Sam S. Goldstein Industries, Inc. v. Botany Industries, Inc.,* 301 F.Supp. 728 (S.D.N.Y.1969); *Tuvache, Inc. v. Emilio Pucci Perfumes International, Inc.,* 263 F.Supp. 104 (S.D.N.Y. 1967).

Yet, in a case procedurally similar to the instant trademark litigation, *Driving Force, Inc. v. Manpower, Inc.,* 498 F.Supp. 21 (E.D. Pa.1980), the court stated that where Trademark Trial and Appeal Board adjudication would materially aid in ultimately deciding the issues presented before the court, the district court would stay the court proceeding until a decision was reached by the Appeal Board. *Id.* at 25. The court noted the specialized knowledge and experience of the Board and that the Board "is better equipped than are the courts to make an initial determination as to trademark registration and infringement." *Id.* After the Trademark Trial and Appeal Board rendered its decision, the district court resumed jurisdiction of the case and considered the merits of the action. *The Driving Force, Inc. v. Manpower, Inc.,* 538 F.Supp. 57, 59–60 (E.D.Pa.1982).

In this case, there is much merit in allowing the Trademark Trial and Appeal Board to initially consider plaintiff and defendants' contentions. It is axiomatic that this body has specialized expertise and experience in this area, and

> [t]he exercise of the court's discretion is guided in this situation by a desire for uniformity of regulation and the need for initial consideration by a body possessing special expertise in the issue presented.

*Board of Education of the City School District of New York v. Harris,* 622 F.2d at 607 (citation omitted).

For these reasons, the suit before this court between C-Cure Chemical Co. and Secure Adhesives will be stayed, pending a final decision by the Trademark Trial and Appeal Board in regard to Secure Adhesives' petition for cancellation of C-Cure Chemical's trademark.

Accordingly, for the foregoing reasons, plaintiffs' motion to reinstate the preliminary injunction is denied, and defendant Secure Adhesives' motion to vacate the preliminary injunction is granted. Defendant Olympia's motion to dismiss plaintiff's Lanham Act count is granted, and Olympia's motion to dismiss the remaining counts on the basis of *forum non conveniens* is also granted. This action shall be stayed, pending a final determination by the Trademark Trial and Appeal Board; however, the parties may engage in discovery. All discovery matters shall be completed on or before January 9, 1984. Defendant Joseph Schochet's motion to dismiss will be considered after the Trademark Trial and Appeal Board proceeding has concluded.

So ordered.